UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JAQUARI TROTTER,
GREGORY ROGERS,

    Defendants.
_____/

Hon. Hala Y. Jarbou

Case No. 1:20-cr-0186

# MEMORANDUM OPINION AND ORDER

This matter is before the Court on the government's motion for an order to show cause why counsel for defendants should not be sanctioned for an alleged breach of a protective order regarding discovery. (ECF No. 153 (restricted access)). Defense counsel have responded, all denying that they took any action that violated any term of the protective order. (ECF No. 155, 156 (restricted access)).

The government contends that a photograph it received from a law enforcement source depicts a verbatim account of a grand jury witness's testimony. The government further asserts that a file name contained in the photographed document indicates that the information in the document came from discovery provided to defense counsel under the protective order. The government is unable to identify the person who drafted the document, nor can it identify the person who took the photograph. The government has asked the Court to make inquiries of defense counsel regarding the drafting and dissemination of the document.

Having determined that the government has failed to meet its burden of showing by clear and convincing evidence that a knowing and willful violation of the protective order has occurred, and for the reasons stated herein, the Court will decline the government's request to question defense counsel and it will deny the show-cause motion.

## Preliminary Notes

Before turning to the merits of the pending motion, the Court will address several collateral issues.

In the instant motion, the government places great emphasis on the fact that, on February 6, 2022, the home of two grand jury witnesses was shot at multiple times by two assailants. (ECF No. 153, PageID.1352 (restricted access)). Two suspects are in custody. One of these individuals allegedly received the photograph in question on March 27, 2022, while in custody on state charges.[1] (*Id.*). The government asserts that the dissemination of the information contained in the document depicted in the photograph prompted the attack on the grand jury witnesses' home. The photographed document contains some of the testimony of one of these grand jury witnesses ("J.J."). It is not clear, however, how the photographed document was the motivating factor for the attack on J.J.'s home, given that it was received by the suspect some seven weeks after the shooting incident.

---

[1] The government has more recently provided evidence that the other suspect received a copy of the photograph on March 26, 2022. (ECF No. 161, PageID.1473 (restricted access)).

2

More to the point, however, none of this is relevant to the Court's determination of whether anyone violated a provision of the protective order. The Court is deeply concerned for the safety of witnesses and others who participate in the judicial process. But the Court cannot allow those concerns to override the legal issue before it, which is whether the photographed document demonstrates that there was a knowing and willful violation of the protective order.

Further, the Court questions the government's contention that the protective order was intended "to prevent precisely what happened here – disclosure of a witness's statement where there was a real possibility of retaliatory violence against that same witness." (Govt's Suppl. Br. at 2, ECF No. 161, PageID.1474 (restricted access)). That may have been the government's intention, but if so, the protective order manifestly fails that purpose, even under the government's interpretation of its terms. There is nothing in the protective order that prevents defense counsel from disclosing to their clients the names of grand jury witnesses, as well as the substance of the witnesses' testimony. To the contrary, the protective order anticipates such disclosure, and even allows the grand jury transcript to be shown to the client. It simply prohibits counsel from leaving a copy of the transcript with the client. (*See* Protective Order for Discovery Material ("Protective Order") at ¶ 6, ECF No. 27, PageID.54). It is the information regarding witness testimony, not the document on which it is printed, that poses the potential for witness intimidation or retaliation.[2]

---

[2] The Court is making no assumptions about either defendant's potential involvement in any attempt to harass or to retaliate against any witness. They enjoy the presumption of innocence afforded them by law.

The Court further notes its concern regarding what appears to be a declining level of civility between the U.S. Attorney's Office and the defense bar. This has become evident in some of the discourse between counsel, and in what appears to be an increase in allegations of misconduct from both sides of the courtroom. Outside the courtroom, cooperation, rather than contention, better serves the interests of justice. Counsel each has respective obligations to his or her client – whether the client is the United States or a criminal defendant. Criminal cases, particularly in federal court, involve serious charges for which defendants are entitled not only to a fair trial, but the appearance of fairness. Counsel should carefully limit their adversarial role to the legal issues before the court, and even then counsel should extend courtesy and respect to opposing counsel at all times.[3]

The allegations raised in the government's motion are quite serious, particularly given the government's contention that the dissemination of the information in the photograph led to criminal conduct. A finding that an attorney knowingly and willfully violated a court order could effectively end that attorney's career. At the very least, it would likely result in a citation for civil contempt, and could expose the attorney to criminal contempt proceedings. It should come as a surprise to no one that such allegations would engender animosity in those accused.

---

[3] "An attorney's conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those terms. In fulfilling our duty to represent a client vigorously as attorneys, we will be mindful of our obligations to the administration of justice, which is a truth-seeking process designed to resolve human and societal problems in a rational, peaceful and efficient manner." WESTERN DISTRICT OF MICHIGAN STANDARDS FOR CIVILITY IN PROFESSIONAL CONDUCT (www.miwd.uscourts.gov/sites/Civility%20Plan.pdf (last viewed May 7, 2022)).

Counsel for the government failed to comply with the Court's local rule requiring her to "confer in a good-faith effort [with opposing counsel] to resolve the dispute" before filing the instant motion, and to file a certificate setting forth the efforts made to resolve the dispute. *See* W.D. MICH. LCRR 12.4. That alone is a basis for denying the motion.

Moreover, when questioned during the April 25 hearing about efforts to discuss the pending issues with defense counsel, government counsel advised that she simply sent an email to defense counsel asking them to state whether they were responsible for disseminating the document in the photograph. She indicated that she expected that email to prompt defense counsel to initiate a discussion with her regarding the issues in the Protective Order. Not surprisingly, that did not happen. Government counsel's approach falls well short of fulfilling counsel's obligations under Local Rule 12.4. It is government counsel who bore the responsibility of engaging in a good-faith effort to comply with Local Rule 12.4's consultation requirement.

A more productive approach would have been to initiate an open-ended discussion with defense counsel regarding the government's concerns relating to the document in the photograph. While such efforts likely would not have resolved the dispute entirely, it would have allowed counsel to discuss their respective views of the provisions of the protective order, narrowing the issues presented to the Court. This likely would have avoided the need for the Court to order supplemental briefing.

Procedural History

On December 16, 2020, the grand jury returned an indictment charging both defendants with assaulting a federal law enforcement officer with a deadly or dangerous weapon, and with using and discharging a firearm during and in relation to that assault. (ECF No. 1). The grand jury also charged Jaquari Trotter with being a felon in possession of a firearm. (*Id.* at PageID.3).

Gregory Rogers was arraigned on January 4, 2021, and the Court appointed an Assistant Federal Public Defender to represent him. (Minutes, ECF No. 10). Mr. Rogers was already in federal custody in a related criminal proceeding. (*See id.*). Jaquari Trotter was arraigned on January 7, 2021, and the Court appointed private counsel from the Criminal Justice Act (CJA) panel to represent him. (Minutes, ECF No. 19). He waived his right to a bond hearing and was ordered detained. (ECF No. 24). Both defendants entered not-guilty pleas. (ECF No. 10, 19).

On January 26, 2021, the Court granted the government's unopposed motion for the entry of the Protective Order. (ECF No. 27). The Protective Order includes a number of provisions restricting access to, and use of, discovery material produced by the government. The Protective Order provides for "civil and criminal sanctions" for any violation of the order. (*Id.* at PageID.55).

The Court entered a second protective order on December 22, 2021. (ECF No. 111). This order required the government to produce to defendants' counsel contact information regarding thirteen witnesses, which the government had previously redacted from police reports produced in discovery. (*Id.* at PageID.943).

The government was also required to advise defense counsel as to which witnesses are represented by counsel. (*Id.*). Defense counsel are precluded from disclosing the contact information to the defendants or to persons associated with them. (*Id.* at PageID.944).

On January 18, 2022, Mr. Rogers pled guilty to the charge of aiding and abetting the assault on a federal law enforcement officer using a deadly or dangerous weapon. (Minutes, ECF No. 131; Amended Minutes, ECF No. 149). The plea was entered pursuant to a written plea agreement. (ECF No. 128). On January 24, 2022, Mr. Trotter pled guilty to assaulting a federal law enforcement officer with a deadly or dangerous weapon. (Minutes, ECF No. 140). He also entered into a written plea agreement with the government. (ECF No. 138). Both defendants are scheduled for a sentencing hearing on May 10, 2022. (ECF No. 132, 141).

On April 20, 2022, the government filed the instant motion seeking an order requiring defense counsel to show cause why they should not be sanctioned for violating the January 26, 2021, Protective Order. (ECF No. 153 (restricted access)). The government alleges that one or more of defendants' counsel violated the protective order, either by disseminating a witness statement outside of the defense team or by leaving a copy of the witness statement in the custody of their respective client. (*Id.* at PageID.1348-49). The motion is predicated on a photograph obtained by law enforcement that had apparently been sent to the suspects in the February 6, 2022, shooting incident. (ECF No. 153-1 (restricted access); ECF No. 161-1 (restricted access)).

7

The photograph depicts a single page from a typed document that includes a verbatim account of at least some of the testimony of one of the grand jury witnesses – J.J. – whose home was attacked.  (Compare ECF No. 153-1 with ECF No. 153-2 (excerpt of grand jury transcript) (restricted access)).  It appears that the photographed document is a single-page from a multi-page document.  The single page depicted in the photograph indicates that each paragraph of the document is numbered – the paragraphs depicted in the photograph are numbered 36 through 40. (*Id.* at PageID.1354).  It is evident from a review of this page that it is both preceded and followed by other pages – it is one page of what could be a fairly lengthy document.  (*Id.*).  The page depicted includes references to a file name the government used in producing the transcript of J.J's grand jury testimony, but it also includes references to "GX 16" (*id.*), the significance of which is not entirely clear.

Counsel for Mr. Rogers filed a response to the government's show-cause motion on April 22, 2022.  (ECF No. 155 (restricted access)).  Counsel take issue with the fact that the government's allegations are being leveled against all three defense attorneys in this case without due diligence and without a sufficient evidentiary basis.  (*Id.* at 1360-61).  Counsel also contend that paragraph 3 of the Protective Order, which addresses "any notes or records of any kind that Defendant or defense counsel may make relating to the contents of the [discovery] materials," allows the disclosure and the defendants' retention of information such as contained in the photographed document.  (*Id.* at PageID.1364 (citing ECF No. 27, PageID.54)). Finally, counsel complain that the government's motion seeks to invade the attorney-

client relationship, as a show-cause hearing would require counsel to disclose information communicated between counsel and client. (ECF No. 155 at PageID.1364-65).

Counsel for Mr. Trotter filed a response to the government's motion on April 24, 2022. (ECF No. 156 (restricted access)). In that response, counsel argues that three provisions of the Protective Order – paragraphs 3, 6 and 7 – demonstrate that the government's motion is unfounded. (*Id.* at PageID.1368-70). Counsel also objects to any intrusion into attorney-client privileged communications. (*Id.* at PageID.1370).

The Court conducted a hearing on April 25, 2022. (Minutes, ECF No. 157). Following that hearing, the Court ordered counsel to file supplemental briefs on the following two issues: (1) whether the terms of the Protective Order clearly and unambiguously prohibit defense counsel from providing his or her client the photographed document; and (2) whether, assuming one of the defense counsel sent the photographed document to his or her client, the attorney-client privilege applies to that communication. (April 26, 2022, Order, ECF No. 159). The government filed its response on April 28, 2022 (ECF No. 161 (restricted access)), and defense counsel filed their responses on May 1 and May 2, respectively (ECF No. 162, 163 (restrictive access)).

## DISCUSSION

The government's show-cause motion presupposes that one or more of the defendants' attorneys violated the Protective Order, and accordingly, that sanctions

9

should be imposed on the violator(s). The government does not specify what sanctions it believes appropriate, should the Court grant its motion. The Protective Order provides for sanctions in the form of civil or criminal contempt. Some discussion of the Court's authority in this regard is appropriate.

It is settled law that federal courts have the inherent authority to punish those who violate court orders. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994). "Courts independently must be vested with 'power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and . . . to preserve themselves and their officers from the approach and insults of pollution.'" *Id.* (quoting *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L. Ed. 242 (1821)). The Supreme Court described the nature and necessity of the contempt power:

> [W]hile it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory.
>
> If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.

*Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911).

Criminal contempt is governed by 18 U.S.C. § 401.22. It provides, in pertinent part, that federal courts "shall have power to punish by fines or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . .

10

[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." *Id.*

In any criminal contempt proceeding, the violation must be proven beyond a reasonable doubt. *See, e.g., Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 632 (1988) (citing *Gompers*, 221 U.S. at 444; *Michaelson v. United States ex rel. Chicago, St. P., M. & O.R. Co.,* 266 U.S. 42, 66 (1924)). If the Court pursues criminal contempt, certain due process rights apply, including notice of the essential facts constituting criminal contempt, a trial, and reasonable time to prepare for trial. FED. R. CRIM. P. 42(a); *see also Bloom v. State of Illinois*, 391 U.S. 194, 210 (1968) (holding that those charged with criminal contempt have a right to a jury trial, unless it is being pursued as a "petty" offense (one punishable by incarceration of six months or less)).

Civil contempt remains a creature of the court's inherent power. *See Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[T]he District Court [is] entitled to rely on the axiom that 'courts have inherent power to enforce compliance with their lawful orders through civil contempt.' " (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). "Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' " *Gompers*, 221 U.S. at 441 (quoting *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 329 (1904)).

The principle purpose of criminal contempt is punitive, "to vindicate the authority of the court." *Gompers*, 221 U.S. at 441. Civil contempt, on the other hand, is remedial and is imposed "for the benefit of the complainant." *Id.*; *see also United*

11

*States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947) (The purpose of civil contempt is "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." (citing *Gompers*, 221 U.S. at 448, 449)). "[A] contempt is considered civil when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public." *McCrone v. United States*, 307 U.S. 61, 64 (1939).

The standards for civil contempt require a showing "by clear and convincing evidence that [the alleged contemnor] 'violated a definite and specific order of the court requiring [him or her] to perform . . . a particular act or acts with knowledge of the court's order.' " *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (quoting *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir. 1987)). The Supreme Court explained the requirement that an order be definite and specific:

> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid. . . . [It must be] a violation of a court order by one who fully understands its meaning but chooses to ignore its mandate.

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). In other words, the contemnor must have acted knowingly and willfully.

An order is definite and specific if it " 'leaves no uncertainty in the minds of those to whom it is addressed . . . precisely what acts are forbidden.' " *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1062 (2d Cir. 1995)); *see also Reed v. Cleveland Bd. of Ed.*, 607 F.2d 749, 752 (6th Cir. 1979) (The order must "clearly tell a reasonable person what

12

he is required to do or abstain from doing."). The Sixth Circuit noted that " 'unbroken lines of authority . . . caution us to read court decrees to mean rather precisely what they say.' " *Grace v. Center for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir. 1996) (quoting *NBA Properties, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990)). The certainty of the order must be ascertained solely from the terms of the order itself. *Cf. Next*, 12 F.4th at 131 (noting that the certainty must be established from the "four corners of the order"). Moreover, "ambiguities must be resolved in favor of persons charged with contempt." *Grace*, 72 F.3d at 1241.

The government contends that the terms of the Protective Order plainly prohibit defense counsel from allowing their clients to retain a document such as is depicted in the photograph. It makes two arguments in support of its interpretation. First, the government asserts that the document constitutes a "grand jury transcript," which the Protective Order explicitly prohibits defendants from retaining. (ECF No. 161, PageID.1476-77 (restricted access)). Second, the government maintains that the document is a "witness statement," the defendants' retention of which is expressly forbidden by the Protective Order. (*Id.* at PageID.1477).

The government's arguments miss the mark. At the very least, the government has failed to show that its interpretation of the Protective Order is the only reasonable one.[4]

---

[4] Inasmuch as the Court finds that the government has failed to establish a violation of the Protective Order by clear and convincing evidence, it need not address the higher standards for criminal contempt.

13

1.  Whether the Document is a "Grand Jury Transcript"

The government cites to the Black's Law Dictionary definition of a transcript: "a 'handwritten, printed, or typed copy of testimony given orally.'" (ECF No. 161 at PageID.1476 (quoting BLACK'S LAW DICTIONARY (11th ed. 2019))). That is an accurate recitation of the definition, but it does little to resolve the question of whether the author of the document knowingly and intentionally violated any term of the Protective order.

The government argues that the document in the photograph is a "transcript" of J.J's grand jury testimony. The Court has carefully compared the typed statements depicted in the photograph with the relevant three pages of J.J's grand jury transcript.[5] With few exceptions, the photograph contains a verbatim account of a relatively small part of J.J's grand jury testimony.[6] It includes the colloquy – questions and answers – from line 15 on page 19 of the transcript through part of line 17 on page 21 of the transcript. (Compare ECF No. 153-1, PageID.1354, with ECF No. 163-5, PageID.1566-68 (restricted access)). In other words, what is depicted

---

[5] The government provided only the relevant three pages of the grand jury transcript. (*See* ECF No. 153-2 (restricted access). The Court is not suggesting that there was anything inappropriate in that, but it is using the 32-page full transcript provided by Mr. Rogers' counsel (ECF No. 163-5 (restricted access)) in order to understand the full context of the testimony at issue, as well as its implications on the issue before the Court.

[6] Omitted from the photographed document are four words from page 19, line 15 of the transcript, and nine lines regarding an exhibit on page 20 of the transcript.

in the photograph represents approximately seven percent of the total colloquy contained in the grand jury transcript.[7]

It is certainly reasonable to believe that the other pages of the document included testimony from other parts of the grand jury transcript, and perhaps the whole of it. But the Court cannot make a finding by clear and convincing evidence based on speculation, plausible or not.

Accordingly, the most the Court can say with confidence is that what is depicted in the photograph is a partial rendition of the colloquy in the grand jury transcript. It also contains references to the government's discovery file designation, along with the designation "GX16." While it may have been the intent of the author of the photographed document to provide a complete transcription of J.J.'s grand jury testimony, the manner in which it is typed – with separately numbered paragraphs – could also fairly be construed as an attorney's method of organizing discovery. The Court simply does not know what else is in the complete document, and how much of J.J.'s testimony is contained therein.

As will be discussed below, the Protective Order does not explicitly prohibit defense counsel from including grand jury testimony within the attorney's "notes or records," and providing those notes or records to his or her client.[8]

---

[7] There are 25 lines on each page of the transcript, and 26 of the 32 pages of the transcript contain the colloquy of J.J's grand jury appearance. There is a total of some 650 lines of which 44 lines of testimony are included the photograph.

[8] In its supplemental brief, the government contends, for the first time, that the inclusion of the grand jury testimony in the document in question violates the provision in paragraph 4 of the Protective Order. (ECF No. 161, PageID.1476 (restricted access)). The government's representation of the terms of this paragraph

15

### 2. Whether the Document is a "Witness Statement"

The government contends that what is depicted in the photograph is a "witness statement." The government further argues that paragraph 6 of the Protective Order prohibits defense counsel from allowing their clients to retain copies of witness statements. (ECF No. 161 at PageID.1477 (restricted access) (citing ECF No. 27 at PageID.54)). Once again, the government is correct, at least to some extent, but it fails to establish a knowing and willful violation of the Protective Order.

The government correctly cites Rule 26.2's definition of a witness statement, which includes "a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording." FED. RULE CRIM. P. 26.2(f)(2). J.J.'s grand jury transcript unquestionably falls within the ambit of this definition, and what is depicted in the photograph certainly contains a substantially verbatim account of *part* of J.J's grand jury testimony. It is fair to say, then, that the photograph depicts a copy of *part* of J.J.'s witness statement, as defined by Rule 26.2. But whether that means it falls squarely and unquestionably within the prohibition of paragraph 6 is less clear.

Paragraph 6 contains language that, at the very least, creates some ambiguity in this regard. It provides as follows: "Counsel for Defendants shall not allow their clients to retain copies of witness statements *in whatever form(s) such statements are produced* (including, but not necessarily limited to, statements made in support of

---

is misleading. Paragraph 4 provides as follows: "Any copies of the materials made by Defendants or Defendants' counsel shall be treated as set forth above." (ECF No. 27, PageID.54). There is nothing in the three paragraphs preceding paragraph 4 that restricts defendants' ability to retain anything.

search warrants, statements contained in written reports, video recordings, and audio recordings"). (ECF No. 27 at PageID.54 (emphasis supplied)). But a question arises as to what is meant by the words "in whatever form(s) such statements are produced."

The government seems to contend that this phrase is to be interpreted to include any part of a witness statement in any form in which it is "produced" by defense counsel. This interpretation would ostensibly foreclose a defense attorney from including any part of a witness statement in the "notes or records" he or she shares with the defendant. That is, at least on its face, a plausible interpretation.

Defense counsel contend, on the other hand, that the phrase refers to the form in which the government produces – or provides – the statement in discovery. That is also a plausible interpretation. In fact, further scrutiny of the Protective Order reveals several reasons to conclude that defense counsel's interpretation may be the more reasonable one.

First, it must be noted that the Protective Order relates only to discovery, and only to discovery provided by the government. It is logical, then, to read the word "produce" as synonymous with the word "provide," which is used elsewhere in the Protective Order, and only with reference to the government as the "provider." (*See* ECF No. 27 at PageID.53, ¶ 1).

Second, Rule 26.2 – upon which the government relies for the definition of "witness statement" – uses the term "produce" throughout its provisions and in a manner that suggests that it is synonymous with the term "provide." *See* FED. R.

17

CRIM. P. 26.2(a) ("the court . . . must order an attorney . . . to *produce*, for the examination and use of the moving party, any statement of the witness" (emphasis supplied)); *see also* FED. R. CRIM. P. 26.2(b) ("Producing the Entire Statement"); FED. R. CRIM. P. 26.2(c) ("Producing a Redacted Statement").

Third, paragraph 7 extends to grand jury transcripts the same client-retention prohibition as in paragraph 6. (ECF No. 27 at PageID.54). But paragraph 7 does not include the phrase "in whatever form the transcript is produced." So, consistent with the government's view, the absence of that language would suggest that defense counsel may be free to allow their clients to retain a verbatim account of grand jury testimony, as long as defense counsel changed the form – for example, in the form of attorney "notes or records" – an interpretation the government opposes (see section 1, above).

In the end, regardless of which interpretation carries greater weight, the fact remains that there are at least two plausible interpretations of the provisions in paragraph 6 of the Protective Order. One of these interpretations undermines the government's contention that paragraph 6 plainly and unambiguously prohibits the client retention of the document depicted in the photograph. Given that the Court must construe any ambiguity in favor of defense counsel, *see Grace*, 72 F.3d at 1241, this ambiguity forecloses a contempt citation.

    3. <u>Whether the Document Constitutes Counsel's "Notes or Records"</u>

While it is reasonable to conclude that the document in question contains a witness statement, that cannot be the end of the analysis. The Protective Order

appears to allow defense counsel to include witness statements in his or her "notes or records," which are not subject to the restrictions in paragraphs 6 and 7.

Paragraph 3 of the Protective Order provides: "Any notes or records of any kind that Defendants or defense counsel may make relating to the contents of the materials shall not be disclosed to anyone other than the Defendants, defense counsel, and persons employed to assist the defense. . . ." (ECF No. 27 at PageID.54). As defense counsel has noted, this provision twice includes the word "any." (ECF No. 163, PageID.1501 (restricted access)). So, it applies to "any notes or records" and the notes or records can be "of any kind." Accordingly, defense counsel argue, "there is no limit on the notes or records . . . that defense counsel can make relating to the contents of discovery material and disclose to clients, subject to the purposes of disclosure outlined in Paragraph 1." (*Id.*). That would include, consistent with defense counsel's plausible interpretation of paragraph 6, parts of witness statements produced by the government.

The Court agrees. There is nothing in the Protective Order that constitutes a definite and specific prohibition on the inclusion of at least part of a witness's statement or part of a witness's grand jury testimony in an attorney's notes or records, copies of which may be left with the client.

The extent to which such statement or testimony may be included is unclear. Equally unclear is the extent to which J.J.'s grand jury testimony is contained in the entire document for which we have one page. But what is clear is that the facts offered by the government fall well short of establishing by clear and convincing

19

evidence that any of the defense counsel knowingly and willingly violated a definite and specific provision of the Protective Order.

Having determined that the government has failed to establish a knowing and willful violation of the Protective Order, the Court need not address the issue of attorney-client privilege.

## CONCLUSION

The government has failed to demonstrate that the Protective Order is reasonably susceptible to only one interpretation. The parties' conflicting – and reasonable – interpretations of the Protective Order precludes a finding of contempt. Accordingly, and for the reasons articulated herein, the government's motion for a show-cause order is **DENIED**.

**DONE AND ORDERED** this ninth day of May, 2022.

   /s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge